RECEIVED
FEB 2 0 2025
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF IOWA**

**TERRY HAMBRICK,**

Petitioner,

Vs. Case No. 4:20cr00089

**UNITED STATES OF AMERICA,**

Respondent.

**MOTION TO VACATE CONVICTION OR SENTENCE PURSUANT TO 28 U.S.C. 2255**

COMES NOW Terry Hambrick, pro-se ("Hambrick"), asking that his claims are construed liberally under *Haines vs. Kerner,* 30 L.Ed.2d 672 (1972), hereby filing this motion to vacate sentence pursuant to 28 U.S.C. 2255. In support thereof, Hambrick states as follows.

## I.

## INTRODUCTION

From the outset of the government's opening statements, throughout trial, all the way up to the denial of Hambrick's motion for new trial, this court, no different than the government, specifically relied upon "testimony that Hambrick sold methamphetamine... *in the same vehicle* (i.e., a white Cadillac Escalade) *prior to the controlled purchase...*" Doc. 485 at 8 (emphasis added) in support of the guilty verdict lodged against Hambrick by the jury. A candid and scrutinizing examination of the hard facts, however, reveals that any testimony presented at trial in that regard, was categorically false.

So too, as will be outlined in the instant 2255 motion, were the government's allegations that Hambrick was involved in a controlled buy on April 9, 2020. He was not.

Keeping these facts in mind, it cannot be emphasized enough that Hambrick, in raising a claim of ineffective assistance of counsel, need not prove that he would have been acquitted of the crime to prevail under the two-prong analysis set forth in *Strickland v. Washington*. Rather, Strickland and its progeny make it abundantly clear that the outcome-based prejudice-prong analysis is grounded in assuring that a criminal defendant receive a fair trial whose result is reasonable.

Hambrick did not receive the benefit of that fair trial as envisioned by the Strickland court, as a direct result of his attorney's ineffectiveness. Thus, for the reasons as set forth herein, this court should vacate Hambrick' conviction and sentence, remanding his case back to this court for a new trial.

## II

## STATEMENT OF FACTS

In November 2020, Hambrick and co-defendant Kieffer Simmons ("Simons") were charged with conspiracy to distribute and distribution of methamphetamine, along with five co-defendants, including Leon Edwards and Leroy Williams. (R. Doc. 2-1.) In November 2021, Hambrick and Simmons proceeded to trial. In its motions in limine the government requested to exclude the testimony and written statement of codefendant Edwards and admit intrinsic evidence about Hambrick. (R. Doc. 356.).

Simmons sought to call Edwards a defense witness. Simmons also presented a purported written statement by Edwards denying any involvement in drug transactions. In June 2021, Edwards pleaded guilty to conspiracy to distribute methamphetamine and possession of a firearm in furtherance of a drug trafficking offense. (R. Doc. 161-2, 397.) At the final pretrial conference, Edwards, through his counsel, indicated he intended to

invoke his Fifth Amendment right against self-incrimination and stated he did not wish to testify. (T-FPTC 5.) The district court declined to create a right to judicial immunity. (T-FPTC 11, 14.) The district court also declined to compel the government to offer Edwards immunity. (T-FPTC 15-16.)

At trial, in the government's opening statement, it highlighted the anticipated testimony of two witnesses who would assert that Hambrick was distributing meth from a white Escalade as early as December 2019 (TT-1 123). In January 2020, law enforcement started using a confidential informant (CS#1) to buy guns and drugs from several people in Des Moines. (TT-I 136-39; TT-II 288-89.)[1] Most of these deals started with Leon Edwards, who would take CS#1 to different gun and methamphetamine sources of supply, including Simmons. (TT-I 148-49.)

On February 28, 2020, Edwards and CS#1 met with Simmons at Simmons' house and purchased approximately 72 grams of methamphetamine. (TT-I 156-61; TT-II 284-85, 296, 304, 306-11, 379; R. Doc. 432-1, 433-1, 433-31.) The deal took place in a Dodge Durango in Simmons' driveway. (TT-II 305-06.) During the deal, Simmons and CS#1 also discussed guns Simmons had and Simmons showed the confidential informant a gun. (TT-II 306-07.) Less than two weeks later, law enforcement arrested Simmons after they found methamphetamine and a digital scale in the garage at Simmons' house. (TT-II 232-37; R. Doc.433-17.).

On January 21, 2020, Edwards facilitated the purchase of a semi-automatic

---

[1] This brief uses the following abbreviations:
"R. Doc." – district court clerk's record, followed by docket entry and page number, where noted; "T-FPTC" – final pretrial conference transcript, following by page number; "TT" – trial transcript, followed by volume and page number;

AK-style rifle between Simmons and CS#1. (TT-I 151-53, 196-201; TT-II 294-96.) Simmons drove his white Jeep to the deal and afterwards went to the Jeep to retrieve a loaded gun magazine to give to CS#1. (TT-II 199-201; R. Doc. 432-2, 433-13.) Edwards also introduced CS#1 to Leroy Williams and CS#1 dealt directly with Williams. (TT-I 162-63; TT-II 285, 298, 311.)

According to the government's theory of the case, on April 9, 2020, Hambrick allegedly supplied Williams with methamphetamine, who in turn supplied CS#1 with approximately 221.9 grams of that methamphetamine. (TT-II 380; R. Doc. 433-2.). According to the case agent, Williams walked to a white Escalade truck, met with Hambrick, and departed with a clear makeup style case with a black plastic bag containing methamphetamine. (TT-II 246-57, 285, 315-16, 320; R. Doc. 433-49, 433-40, 433-41, 433-42, 433-43, 443-44, 443-45.) The testifying agent acknowledged that Hambrick was never part of the investigation. (TT-II 263); did not expect to see Hambrick at the controlled purchase that day (Id.); did not see Williams get into the Escalade (Id.); and, did not see any transaction. (Id. at 265).

The agent, furthermore, acknowledged that, prior to Williams getting into and out of the car with the CI, he was never searched by law enforcement officers for controlled substances. (TT-II 327-328).

The plastic bags that allegedly contained the methamphetamine were submitted for testing. (TT-I 166-67; TT-II 322; R. Doc. 433-3.) Fingerprints belonging to Hambrick, Williams, and CS#1 were located on the plastic bag recovered from Hambrick's vehicle, not the silver package that actually contained the methamphetamine (TT-II 339, 395-401; R. Doc. 433-4, 433-5.).

In addition, the district court allowed evidence from two cooperating witnesses that Hambrick sold drugs as intrinsic evidence to the crimes charged. (R. Doc. 394 at 6; *see also* R. Doc. 356 at 7-8.)

Kyle Turner, a witness produced by the government, who testified to purported transactions with Hambrick prior to the date charged in the conspiracy, claimed that (1) he purchased a pound at a time from Hambrick prior to December 2019 for an unspecified period of time (TT-III at 415), and also, 5-6 ounces of meth 3 or 4 times a week (Id. at 416). These transactions allegedly occurred at Walgreens, at a time prior to December 2019, when Hambrick was driving a white Escalade. (Id., 416-17). Hambrick purportedly fronted Turner meth, and owed Hambrick fifty-five hundred dollars. (TT-II 419;1-5).

Turner testified that the last time he purchased meth from Hambrick was in December 2019 (TT-II 431). Turner also discussed Facebook messages about methamphetamine and drug debt between Turner and Hambrick. (TT-II 419-27; R. Doc. 432-4, 432-5; *see also* R. Doc. 433-48.)

Demarkus Simons, another witness produced by the government in support of its theory that Hambrick was involved in a conspiracy, testified that he met Hambrick within a seven-year timespan, without ever specifying when. (TT-II 441). That he only purchased PCP and Percocet from Hambrick, but that he purchases those drugs daily. (TT-II 442).

Just like Turner, Simons claimed that he met up and purchased drugs from Hambrick at a particular Walgreens, at a time Hambrick was driving a white Escalade and that he seen Hambrick with meth on two occasions – not that he purchased meth from him.

(TT-II 442-445). Simons alleged that Hambrick knew, on a personal level, Leroy Williams, but that he had never seen them together (Id.).

Significantly, Simons testified that he seen, with his own eyes, Kyle Turner walking away from Hambrick's white Escalade without specifying a time period – although Turner specifically testified that, the last time he dealt with Hambrick, was in December of 2019 (TT-II 416-17 compared to 446).

Simons also testified, in a purely hearsay manner, that Hambrick told him that Kyle Turner owed him fifty-five hundred dollars (TT-II 447).

In closing arguments, the government reiterated the alleged drug dealing activities between Turner, Simons and Hambrick (TT-II 532).

Following a three-day trial, both Simmons and Hambrick were convicted. (R. Doc. 416.) Significantly, notwithstanding the fact that Hambrick repeatedly put his attorney on notice of the fact that he had proof, a bill of sale, that he did not purchase or have possession of the white Escalade until April 9, 2020 – months after Turner claimed to be purchasing meth from Hambrick out of the white Escalade in December, 2019, and Simon claiming that he seen Turner getting out of Hambrick's white Escalade, which was the last time he seen the both of them together – Hambrick's attorney failed to present the said bill of sale as evidence at trial, and cross examine both Simons and Turner about their obviously false testimony in that regard. See Exhibit 1, copy of April 9, 2020, Bill of Sale.

Furthermore, notwithstanding the fact that Leroy Williams never testified that he acquired the meth from Hambrick during the April 9, 2020 encounter – in conjunction to the case agent acknowledging that Hambrick's name never came up in the

investigation, that he did not know Hambrick, and did not search Leroy Williams prior to him getting into Hambrick's truck (TT-II 327-329) – counsel never sought to interview Williams to see whether or not Williams actually acquired the meth from Hambrick on April 9, 2020.

Had he done so, counsel would have discovered that Williams would have testified that he never purchased any meth from Hambrick during the course of the April 9, 2020 incident. See Exhibit 2, sworn affidavit of Williams.

In any event, Hambrick filed a motion for a new trial arguing a new trial was warranted because the district court erred in allowing the testimony of the cooperating witnesses and due to alleged newly discovered evidence. (R. Doc. 436.) The district court denied Hambrick's motion, relying, in part, on the testimony of Simons and Turner. (R. Doc. 485.)

In May 2022, Hambrick was sentenced to a term of imprisonment of 360 months, followed by a five-year term of supervised release. (R. Doc. 517.)

Hambrick filed a timely notice of appeal (R. Doc. 496, 519.). On appeal, Hambrick made the following arguments:

I. Whether the jury's verdict was based on ample evidence that Hambrick conspired and distributed methamphetamine to a middleman, including identification of Hambrick and his vehicle, Hambrick's fingerprints on the drug packaging, and phone records showing the middleman called Hambrick?

II. Whether intrinsic evidence from cooperating witnesses about Hambrick dealing drugs to them in the same car and near the same locations as the charged crimes was properly admitted?

On June 14, 2023, the Eighth Circuit issued an order affirming the judgment issued by the district court. *U.S. v Simmons,* 70 F.4d 1086 (8th Cir. 2023). In doing so, the Eighth Circuit found, first of all, that the evidence was sufficient to sustain the conviction.

Second, the Eighth Circuit found that it did "not need to resolve the purpose for which K.T.'s and D.S.'s testimony was offered because Hambrick's challenge does not survive the third prong of plain error review. An error affects a substantial right if there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States,* 578 U.S. 189, 194 (2016) (citation omitted). The testimony of the agent and the CI, Williams's phone records, the fingerprints on the bag of methamphetamine, and the supporting exhibits all support the jury verdict without the testimony of K.T. and D.S." See pg. 13 of 6/14/2023 memorandum opinion.

It's against this backdrop, that the Eighth Circuit affirmed. Id.

Hambrick filed a timely petition for rehearing, which was denied August 22, 2023. This timely writ of certiorari followed.

## III.

## ARGUMENT

### A.

### COUNSEL WAS INEFFECTIVE FOR FAILING TO INTERVIEW LEROY WILLIAMS PRIOR TO TRIAL, WHICH WOULD HAVE RESULTED IN WILLIAMS TESTIFYING THAT HE NEVER PURCHASED ANY CONTROLLED SUBSTANCE FROM HAMBRICK ON THE DAY OF THE APRIL 9, 2020 TRANSACTION

Counsel's performance was deficient, in failing to interview Leroy Williams prior to trial, for the purposes establishing whether Williams actually purchased or procured

meth from Hambrick during the course of the purported April 9, 2020 transaction. He (Williams) did not. See Sworn Affidavit annexed hereto, as Exhibit 2.

Absent this material omission on the part of counsel, failing to interview Williams, there's a reasonable probability that the outcome of the proceedings would have been different, i.e., Hambrick was sufficiently prejudiced by counsel's omissions in this instance.

**A. <u>Standard of Review</u>**

The Supreme Court, in *Strickland v. Washington*, 466 U.S. 668 (1984), set forth the basic framework for evaluating ineffective assistance of counsel claims. To succeed on such a claim a petitioner must make two showings. The petitioner must first demonstrate that his lawyer's performance was so derelict that "counsel was not functioning as the `counsel' guaranteed by the Sixth Amendment." Id. at 687. Then he must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.; see also *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (requiring a defendant to show that counsel's errors deprives the accused of a substantive or procedural right, thereby rendering the trial proceedings unfair or the result unreliable).

To prove deficient performance, "a petitioner must demonstrate that counsel's representation `fell below an objective standard of reasonableness.'" Id. at 688. This is a highly deferential standard supported by a strong presumption that the decisions of counsel fall within a wide range of professional assistance. A "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with

obvious unfairness." Johnson v. Dretke, 394 F.3d 332, 337 (5th Cir. 2004), cert. denied, 127 S.Ct. 383 (2006).

Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, and Petitioner must demonstrate "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

**B. Discussion**

**(i). Counsel's performance was deficient**

The Eighth Circuit has "stated that failing to interview witnesses or discover mitigating evidence may be a basis for finding counsel ineffective within the meaning of the Sixth Amendment right to counsel.'" *Kramer v. Kemna*, 21 F.3d 305, 309 (8th Cir. 1994) (citing Kenley v. Armontrout, 937 F.2d 1298 (8th Cir. 1991)). "Such a failure is not, however, a conclusive indication of ineffective assistance of counsel," rather Petitioner must still "`make a substantial showing that, but for counsel's failure to interview . . . the witnesses in question, there is a reasonable probability that the result of his trial would have been different." Id.

Furthermore, movants are required to make "a clear showing . . . that important potential testimony would have been discovered in an interview." *Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir. 1989), cert. denied, 493 U.S. 898 (1989) (citations omitted) (finding that a petitioner's failure to offer an affidavit or testimony of the witness at issue leaves the court to speculate whether the witness might have testified that petitioner was innocent, which "is simply inadequate to `undermine confidence in the outcome'" (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

Against this legal backdrop, as an introductory matter, it can't be emphasized enough that Hambrick has always maintained his innocence of the criminal offense for which he has been convicted, even at his sentencing hearing (See Sent. At 2-3). Consequently, it almost goes without saying that Hambrick repeatedly advised his attorney that he did not provide any meth to Leroy Williams on April 9, 2024.

These complaints, as fate would have it, apparently fell upon deaf ears because counsel failed to even so much as conduct an interview of Williams, essentially the only individual seemingly connecting Hambrick to the purported April 9th transaction – being that the testifying agent acknowledged that Hambrick was never part of the investigation. (TT-II 263); did not expect to see Hambrick at the controlled purchase that day (Id.); did not see Williams get into the Escalade (Id.); did not see any transaction. (Id. at 265); and, prior to Williams getting into and out of the car with the CI, he was never searched by law enforcement officers for controlled substances. (TT-II 327-328).

Indeed, absent Williams omitted testimony, which would have provided context to the testimony of the case agent and the CI, the government presented virtually no evidence that Hambrick was involved in the April 9, 2020 drug transaction, at all, besides Hambrick's fingerprints found on the black plastic bag, rather than the silver packaging that actually contained the meth.

Keeping these facts in mind, annexed hereto is a sworn affidavit outlining precisely what Williams would have testified to had he been called as a witness to testify at trial. See Ex. 2. Significantly, Williams asserts that "Hambrick did not supply me with meth on April 9, 2020. Nor was Hambrick my supplier," completely exonerating Hambrick of any criminal liability. Ex. 1, para. 4. Likewise, Williams explains in vivid detail how Hambrick

was inadvertently “ensnared into [his] conspiracy” only as a result of Williams requesting, without any objection from Hambrick to “use[] an empty plastic bag” he secured “off of the floor of [Hambrick's] vehicle”. Id. at para. 5.

From there, Williams describes what really occurred as it relates to the April 9, 2024 controlled buy between him and the CI – a drug transaction that had nothing to do with Hambrick, other than Hambrick being at the wrong place, at the wrong time, and innocently allowing Williams to have the black plastic bag on his Escalade floor, without having any idea that Williams was going to utilize that bag to facilitate a drug transaction. See Ex. 2, para. 6-11. Indeed, according to Williams, Hambrick did not even know that Williams was a drug dealer. Id. at para. 8.

It must be noted, too, that Williams was offered a substantial time reduction by the Assistant U.S. Attorney if he agreed to testify against Hambrick – an offer rejected by Williams, something he said he “couldn't do... in good conscious because Hambrick never gave me any drugs and I was baffled how Hambrick was even involved...” Id. at para. 9.

Finally, Williams made it abundantly clear that, had Hambrick's attorney interviewed and called him as a witness at trial, Williams would have testified to everything in his sworn affidavit, on behalf of Hambrick. Id. at para 10-11.

Armed with the daunting and material facts set forth in William's affidavit, counsel had an obligation to interview witnesses who are known to have knowledge of the crime with which the defendant is being charged, at least where there is reason to believe the testimony will be favorable to the defense. _Miller v. United States_, 479 A. 3d 862 (D.C. App. 1984). Williams clearly would have provided such favorable testimony. See Ex. 2.

sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. In this instance, prejudice occurred if counsel's deficient "conduct so prejudiced [Chambers] as to undermine confidence in the outcome of the trial," *Byrd v. Armontrout*, 880 F.2d 1, 4 (8th Cir. 1989).

Here, the record plainly reflects that, had counsel called Williams to testify on Hambrick's behalf, there's a reasonable probability that the outcome of the proceedings would have been different. Id. This is unequivocally so, in light of the fact that William's testimony would have completely exonerated Hambrick of the April 9, 2020 transaction, as memorialized in Count 7 of the indictment. See Ex. 2. Having been exonerated of the offense, it would have been exceedingly difficult for the government to make a case in front of the jury that Williams secured meth from Hambrick, meth that was ultimately distributed to the CI that same day.

Indeed, based on William's testimony, the government would have been hard-pressed to avoid moving for the dismissal of the April 9, 2020 controlled buy, in that, the government would not have had a witness to testify that Hambrick distributed meth to anyone pursuant to Count 7 of the indictment.

Thus, a candid and scrutinizing examination of the record reveals that Hambrick was prejudiced by counsel's omissions in failing to interview and call Williams as a witness at trial, on Hambrick's behalf. Equally important here, is that, Hambrick's claims, if proven true, would entitle him to relief from his conviction – this court, consequently, should schedule an evidentiary hearing to flesh out the record on this issue.

"Favorable" because William's testimony straight forwardly corroborates why Hambrick's fingerprint was discovered on the black plastic bag, but not on the silver package that contained the meth the subject of the purported April 9, 2020, transaction. This evidence presented to the jury, would have been an excruciating blow to the government's case, that was already lacking even in circumstantial evidence tying Hambrick to the transaction, and furthermore, the purported conspiracy count.2

Here, Hambrick has fulfilled his obligation to "[n]ame the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony and show that the testimony would have been favorable to a particular defense." *Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008); *Chambers v. Armontrout*, 907 F.2d 825, 829 (8th Cir. 1990) (vacating sentence where defense counsel failed to interview or call witness to testify counsel);

It's against this backdrop, Hambrick asserts that counsel's performance was deficient under the first prong of the Strickland analysis.

**(ii). Hambrick was prejudiced by the omissions of counsel**

Under *Strickland,* the question remains whether, in light of all the circumstances, counsel's deficient performance resulted in any prejudice. Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors," the "result would have been different." *Strickland,* 466 U.S. at 694-95, 104 S.Ct. at 2068; *Sanders v. Trickey,* 875 F.2d 205, 208 (8th Cir. 1989). "A reasonable probability is a probability

[2] The Eighth Circuit, in affirming Hambrick's conviction and sentence, implicitly acknowledged that the testimony of Kyle Turner and Demarkus Simons would not have been permissible in front of the jury but found that it did "not need to resolve the purpose for which K.T.'s and D.S.'s testimony was offered because Hambrick's challenge does not survive the third prong of plain error review. An error affects a substantial right if there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (citation omitted).

**B.**

## COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE OF HAMBRICK'S BILL OF SALE ESTABLISHING THAT HE DID NOT OWN A CADILLAC ESCALADE AT THE TIME THAT BOTH WITNESSES TESTIFIED TO ALLEGEDLY PURCHASING DRUGS FROM HIM

Counsel's performance was deficient, in failing to present evidence of Hambrick's Bill of Sale on his Escalade Cadillac truck which would have established that it was impossible for Hambrick to have been distributing meth to Kyle Turner and Demarkus Simons at any time prior to the alleged April 9, 2020 transaction. See Ex. 1, copy of bill of sale. Indeed, Hambrick did not purchase the said Escalade Cadillac truck until April 9, 2020.

Hambrick specifically told his attorney to acquire a copy of the said bill of sale, and present it as evidence at trial that Turner and Simons were providing false testimony. Counsel ignored Hambrick's request.

Absent this material omission on the part of counsel, failing to present the said bill of sale as evidence at trial, there's a reasonable probability that the outcome of the proceedings would have been different, i.e., Hambrick was sufficiently prejudiced by counsel's omissions in this instance.

**(i). Counsel's performance was deficient**

The Strickland court stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; see *Newbury v. Stephens*, 756 F.3d 850, 873 (5th Cir. 2014); *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997). "In any

ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Counsel's investigation decisions "depend[] critically" on "information supplied by the defendant." Id. The reasonableness of counsel's investigation decisions "can be assessed by taking into account the defendant's own statements, actions, and information supplied by the defendant; whether counsel has reason to believe that pursuing certain investigations would be fruitless or even harmful; resource constraints; and whether the information that might be discovered would be of only collateral significance." *Hoffman v. Cain*, 752 F.3d 430, 440 (5th Cir. 2014).

Keeping these legal principles in mind, and, it should not take a stretch of one legal imagination to arrive at the conclusion that counsel dropped the ball, woefully, when he failed to "take into account" Hambrick's "statements... and information" Hoffman, id., at 440, concerning the bill of sale for his White Escalade Cadillac truck, which would have proved, categorically, that Turner and Simons provided false testimony when they both asserted, repeatedly, that, at the time they purchased meth from Hambrick, at a parking lot in Walmart, he was driving his white Escalade Cadillac truck – a straightforward impossibility, up until April 9, 2020. See Ex. 1.

More specifically, both Turner and Simons testified that, prior to April 9, 2020, they both purchased some kind of controlled substances from Hambrick, at a time Hambrick was allegedly driving his white Escalade truck (TT-II 415-17, 431, 442-446, annexed hereto as Exhibit 3). The bill of sale, however, proves without any doubt or contradiction, that both Turner and Simons were lying. See Ex. 1.

Indeed, the April 9, 2020 bill of sale plainly discredits all of the testimony provided by Turner and Simons in relation to any purported conspiracy charged by the government.

Of significant import here, is the fact that the government, from its opening statements (TT-I 123, Exhibit. 3) all the way through to its closing arguments, specifically highlighted the testimony of Turner and Simons who asserted that Hambrick was distributing meth from a white Escalade as early as December 2019 (TT-II 532, Ex. 3).

In short, the false testimony of Turner and Simons infected and polluted the fundamental fairness of the trial in a manner that should not be taken lightly, as a result of the fact that, without the testimony of those two witnesses, the government had zero evidence against Hambrick, when taking into account what Leroy Williams would have testified to in the event that counsel properly pursued that viable theory of defense by simply conducting an interview with Williams, during the pretrial stages of the proceeding. See Ex. 2, affidavit of Williams.

Indeed, this is not a situation where the bill of sale and William's affidavit "would be of only collateral significance." *Hoffman v. Cain*, 752 F.3d 430, 440 (5th Cir. 2014). To the contrary, these two pieces of critical, material evidence had (and has) the ability to literally make or break the government's case – in this instance, clearly "[b]reak."

It's against this backdrop, that it almost goes without saying that, as a result of counsel's unprofessional omissions, Hambrick was deprived "...a fair trial, a trial whose result is reliable." Id.; see also *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (requiring a defendant to show that counsel's errors deprives the accused of a substantive or procedural right, thereby rendering the trial proceedings unfair or the result unreliable).

Counsel's performance, consequently, was deficient in this regard.

**(ii). Hambrick was prejudiced by counsel's omissions**

To establish prejudice for failure to investigate, "a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial." *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005). See *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010).

Here, counsel's blunder concerning the bill of sale, should not be considered in a vaccum. Rather, in assessing the scope of the prejudice to the outcome of Hambrick's trial, in this instance, this court must juxtapose counsel's error here, to his failure to interview, then secure the testimony of Williams at trial. See Ex. 1-2.

When doing so, the conclusion becomes inescapable that, absent counsel's errors, there's a reasonable probability that the outcome of the trial would have been different – i.e., the government, on Count 7, would have been deprived of any evidence that Hambrick engaged in, or was otherwise involved, in the April 9, 2020 controlled buy. See Ex. 2; and, would have had no evidence, at all whatsoever, to tie Hambrick to a conspiracy through the testimony of Turner and Simons. That is, unless, the government was going to endorse and actually present, false testimony presented by Turner and Simons.

It's against this backdrop, Hambrick asserts, that absent counsel's errors, there's a reasonable probability that the outcome of the trial would have been different. Strickland. Equally important to outcome of that legal inquiry, Hambrick's claims, if proven true, would entitle him to relief from his conviction and sentence. This court

should consequently, schedule an evidentiary hearing to flesh out the record on this meritorious issue.

## C.

## COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE PRESENTATION OF THE TESTIMONY OF TURNER AND SIMONS, IN THAT, THEIR TESTIMONY WAS OUTSIDE THE SCOPE OF THE CONSPIRACY, AND DID NOT CONSTITUTE PROPER 404(b) EVIDENCE

Counsel's performance, in the district court, was deficient, in that counsel failed to object to the presentation of the testimony of Simons and Turner as (1) being outside the scope of the conspiracy charged in the indictment; and (2) improper 404(b) evidence. Had counsel timely and properly objected to the said testimony, then Hambrick, on direct appeal, would not have been subject to the higher standard of review, plain error, in relation to the very same claim raised here.

And with that being the case, there's a reasonable probability that, had the said claim been raised on direct appeal, pursuant to an abuse of discretion standard, there's a reasonable probability that the outcome of the proceedings would have been different – i.e., Hambrick would have prevailed on direct appeal. Or, in the alternative, would have prevented the government from presenting the testimony of Simons and Turner.

Absent this material omission on the part of counsel, there's a reasonable probability that the outcome of the proceedings would have been different, i.e., Hambrick would have prevailed in getting Turner and Simon's testimony excluded in the district court, thus eliminating, even further, Hambrick's connected to the criminal conduct charged in

Counts 1 and 7; or, would have prevailed on direct appeal in relation to the instant case claim.3

**(i). Counsel's performance was deficient**

A conscious and informed decision to pursue a particular trial strategy is "virtually unchallengeable" in federal habeas proceedings. *Pape v. Thaler,* 645 F.3d 281, 289 (5th Cir. 2011). A "conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009). Indeed, strategic choices that actually imperil the defendant's case, cannot be considered "sound" strategic choices. *Ege v. Yukins*, 485 F.3d 364, 378-79 (6th Cir. 2007); *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006); *Stadler v. Curtin*, 682 F. Supp. 2d 807, 825 (E.D. Mich. 2010). For example,Strategic choices by counsel, such as the failure to object to obviously tainted and inadmissible evidence, *Ege*, 485 F.3d at 378-79, have been found to be so unsound as to negate the finding that counsel's performance was in accordance with "prevailing professional norms." *Wiggins*, 539 U.S. at 521.

Keeping this legal standard in mind, the Government utilized the testimony of Turner and Simons regarding Hambrick's alleged prior bad acts pursuant to Fed. R. Evid.

---

[3] Again, the Eighth Circuit, in direct response to this claim raise on direct appeal under the plain error standard, found that it did "not need to resolve the purpose for which K.T.'s and D.S.'s testimony was offered because Hambrick's challenge does not survive the third prong of plain error review. An error affects a substantial right if there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (citation omitted). The testimony of the agent and the CI, Williams's phone records, the fingerprints on the bag of methamphetamine, and the supporting exhibits all support the jury verdict without the testimony of K.T. and D.S." See pg. 13 of 6/14/2023 memorandum opinion.

404(b). (R. Doc 356, at 7). Generally, evidence of prior bad acts is inadmissible to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." _United States v. Adams_, 783 F.3d 1145, 1149 (8th Cir 2015) See also Fed. R. Evid. 404(b)(1) This prohibition on admissibility only applies to extrinsic evidence. "Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred." _United States v. Thomas_, 760 F.3d 879, 883 (8th Cir. 2014).

In the present case, the testimony of Turner and Simon was not "intrinsic;" neither witness provided anything that could be considered "context" to either charge. Count I alleged Hambrick's participation in a conspiracy to distribute 50 grams or more of methamphetamine. (R. Doc 2, at 1) Neither Turner or Simon provided any testimony regarding the existence of a conspiracy, let alone Hambrick's participation in any such conspiracy. (Tr. Vol II p197– 239) The testimony provided by Turner and Simons, if true, only reflects their individual interactions with Hambrick for the purchase of controlled substances, not that Hambrick was involved in a joint enterprise for the sale of controlled substances.

However, that does not make the evidence admissible for consideration as to Count VII wherein Hambrick is charged with the distribution of more than 50 grams of methamphetamine. (R. Doc. 2, at 5) That charge specifies a date of offense of April 9, 2020 and neither Turner or Simons testified that they purchased any illegal substances from Hambrick on or near that date. (Tr. Vol II p197-239)

While the Government is given some leeway regarding dates alleged in the indictment, they are obligated to establish the offenses occurred at a time "reasonably

near the dates alleged." United States v. Turner, 975 F.2d 490, 494 (8th Cir. 1992), cert denied, 506 U.S. 1082, 113 S.Ct. 1053, 122 L.Ed.2d 360 (R. Doc. 418, at 16). Turner's testimony was itself, without sufficient context regarding dates of alleged interactions to make it relevant to the charges filed against Hambrick. The charges levied against Hambrick were for alleged criminal conduct "at least as early as January 2020, and continuing until on or about November 17, 2020" and "on or about April 9, 2020." (R. Doc. 2, at 1 & 5). Turner's testimony included only a vague timeframe with a start date prior to the dates alleged in the indictment and with no identified termination date, but presumably before Turner was taken into custody. (Tr. Vol II p200 ln 19 20) There was no testimony from Turner regarding a conspiracy (within the broad dates of that alleged offense) and no testimony regarding specific dates of his alleged purchases at or near the April 9, 2020 date alleged in Count VII.

Indeed, Turner specificallly testified that the last time he purchased meth from Hambrick was in December 2019 (TT-II 431). When comparing that testimony to the charged conspiracy, starting "at least as early as January 2020, and continuing until on or about November 17, 2020" and "on or about April 9, 2020." (R. Doc. 2, at 1 & 5), its abundantly clear to see that any testimony provided by Turner was outside the scope of the charged conspiracy – and could not even be categorized as "reasonably near the dates alleged." United States v. Turner, 975 F.2d 490, 494 (8th Cir. 1992). Not "near" because the indictment specifically stated "*at least as early as January 2020*" Id. (emphasis added).

Similarly, Simon's testimony was devoid of any timeframe for his interactions with Hambrick. The only information hinting at a timeframe was the exchange: "Q: How is it

that you first came to know Terry Hambrick? A: Within a seven-year time frame, mutual friends." (Tr Vol II p 226 ln 12-18) Simon provided no specific dates of his alleged drug purchases; Indeed, his testimony did not even offer a general indication of month or year when any alleged purchases took place. The Court's limiting instruction improperly observed that "you have just heard testimony that Defendant Hambrick was selling controlled substances other than methamphetamine during the time period charged in the indictment." (Tr. Vol II p 232 ln 14-17) (emphasis added) That is an inaccurate representation of the testimony provided by Simon. His testimony was, at best, that he knew Hambrick for a period of seven years and, at some point during that seven-year period, Simon purchased illegal or controlled substances from Hambrick. (Tr. Vol II p 221 - 232) The testimony of Turner and Simon cannot be considered "intrinsic" to the Government's case without any thread of connection to the dates alleged in the Indictment; without any link between the dates of the interactions testified to by Turner and Simon and the dates alleged in the Indictment, their testimony lacked any relationship in time to the indicted offenses so as to be admissible pursuant to Fed. R. Evid. 404(b)(2).

As a result, their testimony was evidence of prior bad acts introduced solely for the uses prohibited by Fed. R. Evid. 404(a)(1) and should not have been admitted. Even assuming the testimony had any proximity to the times alleged in the Indictment and could be admitted under Fed. R. Evid. 404(b)(2) the District Court still must weigh the admission against the exclusionary provisions of Fed. R. Evid. 403. The evidence of Turner and Simon was unfairly prejudicial to Hambrick, confused the issue of the charged conduct and the alleged illegal transactions between those witnesses and

Hambrick (not charged) and mislead the jury as to conduct charged and uncharged alleged illegal conduct. The Court should have excluded the testimony pursuant to Fed. R. Evid. 403.

Not only was the elicited testimony misleading as to the dates in which the alleged uncharged interactions occurred in relation to the charged conduct dates, the amounts of illegal substances alleged to have been purchased by Turner was without any independent verification or even foundation as to Turner's knowledge of weights and measures. (Tr. Vol II p 197 - 221) This lack of foundation or verification of the transactions to which Turner testified, resulted in wildly speculative figures being presented to the jury, leading to potential confusion during deliberations related to the amount of methamphetamine for which Hambrick was alleged to be responsible in both counts I and VII.

Absent the testimony of Turner and Simon, there was a paucity of evidence linking Hambrick to either a conspiracy (Count I) or an illegal transaction near April 9, 2020 (Count VII). The improper admission of Turner and Simon's testimony allowed otherwise inadmissible evidence to be presented, which led to unfair prejudice to Hambrick and mislead the jury as to the allegations charged and the uncharged alleged conduct testified to by Turner and Simon. The integrity of the trial was compromised by the admission and this Court should overturn the verdict and remand for a new trial without such inadmissible testimony.

Though trial counsel challenged the admissibility of the testimony by response to the Government's Motion in Limine, no contemporaneous objection was raised during trial.

(R. Doc. 381 at 1-2). Counsel's failure to object in this regard, consequently, constitutes a deficient performance.

**(ii). <u>Counsel's performance prejudiced the outcome of the proceedings</u>**

Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors," the "result would have been different." *Strickland*, 466 U.S. at 694-95, 104 S.Ct. at 2068; *Sanders v. Trickey*, 875 F.2d 205, 208 (8th Cir. 1989).

Here, the record is abundantly clear that, absent counsel's failure to lodge an objection to the government's use of the testimony of Turner and Simons on 404(b) grounds, there's a reasonable probability that the outcome of either the trial or the direct appeal proceedings would have been different. This is so because, had the district court been compelled to exclude the said testimony in its totality, the government would have been left with zero evidence to prove Hambrick's involvement in both Counts I and VII. This is particularly so, when taking into account counsel's failure to (1) present the testimony of Leroy Williams; and (2) present the bill of sale related to Hambrick's Cadillac truck, as outlined in Claims A and B set forth above.

In short, had counsel been successful in lodging an objection to the said testimony as violative of Rule 404(b) and Rule 403, there's a reasonable probability that the outcome of Hambrick's trial, shrouded in a limited amount of evidence, would have been different – and Hambrick need not show that he would have been acquitted to show prejudice. See *Foster v. Lockhart*, 9 F.3d 722 (8th Cir. 1993) (stating, to prove prejudice under Strickland, defendant "need not show that he could not have been convicted. Instead, he need only undermined our confidence in the trial's outcome.").

On an alternative basis, in the event that the district court overruled counsel's objection in this regard, there's a reasonable probability that the outcome of Hambrick's direct appeal, grounded in the same claim outlined above, would have been different, i.e., Hambric would have prevailed on direct appeal, convincing the Eighth Circuit Court of Appeals to vacate his conviction and remand his case back to the district court for a new trial.

This is so because, instead of reviewing this claim pursuant to the plain error standard of review, as was done on direct appeal in this case, Hambrick would have had the benefit of having the claim reviewed under a less onerous abuse of discretion standard. *U.S. v Katz*, 445 F.3d 1023 (8th Cir. 2006) ("We review the admissibility of evidence under Rule 404(b) for abuse of discretion. The district court had broad discretion in admitting such evidence and will be reversed only if `such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'"); *United States v. Voegtlin*, 437 F.3d 741, 745 (8th Cir. 2006) (quoting *United States v. Thomas*, 398 F.3d 1058, 1062 (8th Cir. 2005)) (internal citation omitted).

More specifically, when Hambrick raised this very claim on direct appeal, concerning the impermissible use of Turner and Simon's testimony on Rule 404(b) grounds, the Eighth Circuit Court of Appeals found it "not need to resolve the purpose for which K.T.'s and D.S.'s testimony was offered because Hambrick's challenge *does not survive the third prong of plain error review*... The testimony of the agent and the CI, Williams's phone records, the fingerprints on the bag of methamphetamine, and the supporting

exhibits all support the jury verdict without the testimony of K.T. and D.S." See pg. 13 of 6/14/2023 memorandum opinion.

In other words, the Eighth Circuit never ruled upon whether Turner and Simon's testimony was impermissibly submitted pursuant to Rule 404(b) because the remaining evidence in the record, namely, "the testimony of the agent and the CI, Williams's phone records, the fingerprints on the bag of methamphetamine, and the supporting exhibits all support the jury verdict without the testimony of K.T. and D.S." Id. That decision, however, was decided without taking into account counsel's ineffectiveness for failing to (1) interview and call Williams as a witness at trial; and (2) producing a copy of Hambrick's bill of sale, as outlined in Claims A and B.

When negating the validity of the agent and CI's testimony, and Williams phone records by way of Williams sworn testimony (See Exhibit 2); and, Turner and Simons presumptive testimony, by way of Hambrick's bill of sale (Exhibit 1), then, deciding the merits of Hambrick's claim on direct appeal under an abuse of discretion standard, there's a reasonable probability that the outcome of the direct appeal proceedings would have been different.

Why? Because the Eighth Circuit would have been precluded, as a matter of law and fact, from relying upon any of the said evidence to support the jury's finding of guilt. This is especially so when an abuse of discretion standard would have applied, rather than plain error – and, had the district court overruled a properly lodged objection to the presentation of Turner and Simon's testimony, doing so would have constituted an abuse of discretion on appeal, in that, the testimony of Turner and Simons "clearly had

no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'"); *United States v. Voegtlin*, 437 F.3d 741, 745 (8th Cir. 2006).

Keeping these facts in mind, in either scenario, absent counsel's deficient performance, there's a reasonable probability that the outcome of the proceedings would have been different – thus, Hambrick has established that he was prejudiced by counsel's omissions in this regard.

Furthermore, Hambrick's claim, if accepted as true, would entitle him to relief from his conviction and sentence. This court should thus schedule an evidentiary hearing to flesh out the record on this issue.

## D.

## COUNSEL WAS INEFFECTIVE FOR FAILING TO RENEW HIS MOTION FOR CONTINUANCE OF TIME TO PROCEED TO TRIAL

Counsel was ineffective for failing to renew his request for a continuance of the trial prior to its inception, in that, counsel did not have adequate time to prepare for the trial so as to be in a position to lodge and provide an adequate and viable theory of defense to the criminal offense for which Hambrick was charged.

Counsel's performance was deficient in this regard, and adequately prejudiced the outcome of the proceedings.

**(i). Counsel's performance was deficient**

The Sixth and Fourteenth Amendments to the U.S. Constitution guarantee that any person brought to trial in any state or federal court must be afforded the right to assistance of counsel before he or she can be validly convicted and punished by imprisonment. *Faretta v. California*, 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d

562 (1975). Under certain circumstances, denial of a motion for continuance of trial may vitiate the effect of this fundamental right:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849-50, 11 L.Ed.2d 921 (1964) (citations omitted).

To prevail on such a claim, a defendant must show that the denial of the motion for continuance was an abuse of discretion which resulted in specific substantial prejudice. *United States v. Bergouignan*, 764 F.2d 1503, 1508 (11th Cir. 1985).

Armed with this standard of review, as an introductory matter, counsel for Hambrick, Jonah Hammer Dyer, entered his appearance on October 22, 2021 (Doc. No. 351). On that same day, Dyer filed a motion to continue the trial, so as to have time to review the discovery in its totality and from there, formulate a viable theory of defense. (Doc. No. 352). In that motion, notwithstanding the government's resistance thereto,4 Dyer cited 18 U.S.C. 3161(h)(7)(iv) in support of his legal position that the district court should

[4] The government filed a resistance motion on the premise that the case had already been pending for a year; Hambrick had already had three attorneys; and has had two prior continuances granted by the court. See Doc. 354, pg. 1-3.

grant a continuance of time because, "failure to grant a continuance... would unreasonably deny the defendant... continuity of counsel, [and] would deny counsel for the defendant... the reasonable time necessary for effective preparation, taking into account the exercise of due diligence." Id. Doc. 352, pg. 2 (citing 18 U.S.C. 3161(h)(7)(iv) (emphasis added).

Significantly, Dyer only had up until November 15, 2021 to prepare for trial, a total of 24 days – approximately 56 days less than the time allotted to criminal defendants to have access to a speedy trial under the statute, i.e., 70 days. See 18 U.S.C. 3161(c).

The district court ultimately sided with the government, finding that Hambrick, twice, changed attorneys, "three weeks before trial", Id., at 2, and counsel knew of the government's "strong opposition" prior to making an appearance on the case. Id. Finding no good cause for the continuance, the district court denied Hambrick's motion. (Doc. 354).

Against this backdrop, Dyer's performance was deficient in failing to renew his motion for continuance at the outset of the trial proceedings, in that Dyer, for starters, had never tried a federal case prior to Hambrick's. Add in the fact that Dyer only had approximately 24 days to prepare for trial, even though the government's investigation of the instant case spanned over the course of 4 months,5 and the record plainly reflects that Dyer was at a clear disadvantage in proceeding to trial, a fact that prejudiced the outcome of the proceedings, and deprived Hambrick of a fair trial.6

---

[5] See *U.S. v. Simons*, 70 4th 1086, 1088 (8th Cir. 2023).

[6] Although decided in a different context, in *U.S. v. Cronic* the Supreme Court rejected the defendant's claim that his counsel's lack of experience (i.e., very first time trying a criminal case) and short time for preparation

This is so, for example, because the surveillance conducted against Hambrick, himself – not even speaking on the rest of the discovery surveillance evidence that encompassed 4 months of investigation – was almost 7 hours long. With that being the case, Dyer was only able to come visit Hambrick twice, prior to trial, for no longer than an hour on each occasion – and consequently, was only able to show Hambrick a fraction of the 7 hours of surveillance footage. And that's without taking into account the fact that Dyer, during the course of those two short visits, still had to go over the rest of the discovery with Hambrick (i.e., police and lab reports, proffer statements, etc.) – something he clearly lacked the capacity to do, with such a limited amount of time.

Indeed, Hambrick is a direct party to the instant case cause of action. Without him being able to review all of the surveillance evidence, police reports and lab reports, himself, it was impossible for Hambrick to be able to lodge an adequate defense to the criminal offenses, in that, Hambrick was the one allegedly subject to surveillance, not Dyer. In other words, without insight from Hambrick about the facts of his case, such as an interpretation of what was on the surveillance tape, Dyer was in absolutely no position to lodge a defense to the charges.7 See *Strickland*, 466 U.S. at 691, 104 S.Ct.

---

(i.e., approximately 25 days, facts strikingly similar to Hambrick's) warranted a presumption of prejudice, without delving into whether counsel actually provided ineffective assistance of counsel. 466 U.S., at 663–666, 104 S.Ct. 2039. Although Hambrick is not asking this court to make a presumptive finding of prejudice in this case, the holding in Cronic is still informative as it relates to the relevance attached to (1) [T]he time afforded for investigation and preparation; (2) the experience of counsel; (3) the gravity of the charge; (4) the complexity of possible defenses; and (5) the accessibility of witnesses to counsel. Indeed, at the very minimum, each of these factors considered collectively, as set forth above, warrants a finding that Hambrick was deprived of both the effective assistance of counsel, and his due process right to a fair trial.

[7] The Sixth Amendment requires that counsel "make reasonable investigations or make reasonable decisions that particular investigations are unnecessary." *United States v. Soto Hernandez*, 849 F.2d 1325, 1329 (10th Cir. 1988). And whether counsel's failure to investigate a possible defense was reasonable "may be determined or substantially influenced by the defendant's own statements or actions."

at 2066. (stating that "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions.").

Similarly, during trial, because of Dyer's lack of preparedness, he had no idea that fingerprints belonging to Hambrick, Williams, and CS#1 were located on the plastic bag recovered from Hambrick's vehicle, not the silver package that actually contained the methamphetamine (TT-II 339, 395-401; R. Doc. 433-4, 433-5.). Hambrick, during trial, had to literally coach Dyer through which fingerprint was which, and the paramount significance of Hambrick's finger print being on the outside bag, rather than the bag actually containing the methamphetamine, which corroborates Leroy Williams sworn affidavit, i.e., Hambrick was inadvertently "ensnared into [his] conspiracy" only as a result of Williams requesting, without any objection from Hambrick to "use[] an empty plastic bag" he secured "off of the floor of [Hambrick's] vehicle". Id. at para. 5.

The positioning of where the fingerprint was located on the government's evidence, was thus, critical to the presentation of a viable theory of defense to the charges, as can be demonstrated by the sworn affidavit of Williams, testimony that Dyer failed to secure only because of his lack of time to prepare to take Hambrick's case to trial.

In short, the 24 days between Dyer's appearance on the case and trial were simply insufficient, without the assistance of another lawyer or paralegal, to review the discovery, including several hours of surveillance evidence, interview witnesses, and review documents the government continued to provide up to the day of trial. Indeed, the 24 days failed to provide defense counsel with sufficient time to defend against a case which the government four months investigating.

While Hambrick appreciates the heavy caseloads under which the district courts are presently operating and understand their interest in expediting trials, that does not negate a district court's responsibility to caution against the potential dangers of haste, because insistence upon expeditiousness in some cases renders the right to defend with counsel an empty formality. In our system of justice, the Sixth Amendment's guarantee to assistance of counsel is paramount, insuring the fundamental human rights of life and liberty. "The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not still be done." *Gideon v. Wainwright*, 372 U.S. 335, 343, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963) (citation and quotations omitted).

It's against this backdrop, that counsel's performance was deficient for failing to renew Hambrick's request for a continuance of time to prepare for trial

**(ii). Hambrick was prejudiced by counsel's omission**

Hambrick asserts that, had counsel properly lodged an additional objection to the district court's refusal to continue the trial, there's a reasonable probability that the outcome of the proceedings, either in the district court, or Eighth Circuit Court of Appeals, would have been different.

This is so, on the former front, because Dyer, for example, would have had sufficient time to recognize the significance of Williams potential testimony, especially when taking into account (1) Hambrick's utter denial of connection to the crime; and (2) the manner in which Williams plea agreement is drafted, making Williams a perfect canidate to interview to find out if he could corroborate Hambrick's story of non-involvement in the offense – and he could. See Ex. 2, sworn affidavit of Williams.

Armed with the testimony of Williams, in conjunction to Hambrick's bill of sale for his Cadillac truck, as outlined in claims A and B, juxtaposed to a thorough review of the surveillance evidence (which, for all Hambrick knows, could have corroborated his claims of innocence even more, but since he nor Dyer never reviewed it in its totality, Hambrick can only speculate at this juncture), and there's a reasonable probability that the outcome of Hambrick's trial proceedings would have been different, i.e., he could have quite possibly secured an acquittal. *Strickland,* 466 U.S. at 694-95, 104 S.Ct. at 2068; *Sanders v. Trickey,* 875 F.2d 205, 208 (8th Cir. 1989).

On the latter front, and on an alternative basis, for the same reasons outlined above, had the district court overruled Dyers request for a continuance, compelling him to raise the said claim on direct appeal, there's a reasonable probability that Hambrick would have prevailed on appeal.

Again, on an alternative basis, assuming that this court is of the opinion that Dyer's performance was not deficient, and Hambrick was not prejudiced by his conduct, Dyer's was ineffective for even agreeing to make an appearance on Hambrick's case when Dyer knew that the government "strongly opposed" (Doc. 353, pg. 1-2) any continuances of the trial for him to be in a position to review the discovery in its totality and thereafter, formulate a viable theory of defense to the government's case.

Indeed, for the exact reasons as set forth above, agreeing to take on the responsibility of Hambrick's criminal case, knowing that there was a high possibility that the court may not grant him a continuance to prepare for the trial. Dyer was deficient in knowing that possibility existed; and Hambrick was prejudiced in that regard, in that, the record clearly reflect that (1) the district court denied Dyer's request for a continuance;

and (2) Dyer was clearly unprepared to proceed to, and effectively defend Hambrick during trial.

Collectively, Hambrick's claims, if proven true, would entitle him to relief. This court should thus schedule an evidentiary hearing so that Hambrick can flesh out the record on this meritorious issue.

## E.

## COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO IRREGULARITIES IN JURY INSTRUCTIONS AND COUNT 7 OF THE INDICTMENT

Counsel was ineffective for failing to challenge Jury Instruction 15's use of the word "before" when describing the scope of Hambrick's alleged conduct, then move to provide a curing instruction as it related to Turner's testimony that occurred outside the parameters of the charged conspiracy, starting in January, 2020. The use of the term "before" in said jury instruction constitutes a constructive amendment of the indictment. Counsel, moreover, failed to challenge inclusion of the "aiding and abetting" theory in Count 7 of the indictment, in that Hambrick was charged in that Count alone, with no other defendant.

Counsel's performance was sufficiently deficient in this regard, and prejudiced the outcome of the proceedings.

**(i) Counsel's performance was deficient.**

Counsel failed to argue that the inclusion of the word "before" January in Jury Instruction Number 15 improperly broadened the charges against Hambrick, constituting a constructive amendment of the indictment. In *United States v. Harrison-Philpot*, 978 F.2d 1520 (8th Cir. 1992), and *United States v. Ford*, 872 F.2d 1231 (6th Cir. 1989),

courts have held that a constructive amendment occurs when the jury instructions modify essential elements of the charged offense, effectively altering the indictment and violating the defendant's Fifth Amendment rights.

The error here was exacerbated by the fact that all of Turner's testimony pre-dated January 2020, which means that, all of his testimony should have been excluded from consideration by the jury, had counsel properly objected to the "before" terminology in Jury Instruction 15. Counsel thus should have moved to have Turner's (and Simon's) testimony struck from the record, with a curing instruction provided to the jury to disregard the same.

The same principle applies to counsel's failure to Challenge the Inclusion of "aiding and abetting" element in Count 7, especially without providing an aiding and abetting instruction to the jury. "Aiding and abetting" refers to a legal doctrine in criminal law where a defendant is held responsible for a crime even if they did not directly commit the offense, as long as they intentionally assisted or encouraged the principal in the commission of the crime. Under 18 U.S.C. § 2, a person who aids, abets, counsels, commands, induces, or procures the commission of an offense is punishable as a principal, meaning they are liable as if they directly committed the crime themselves.

In analyzing Count 7 in the indictment, it is significant that this charge stands apart from the others, as it is the only count where Hambrick is charged without any co-defendant being implicated in aiding and abetting. This distinction raises several legal concerns. If the indictment suggested that Hambrick's actions were part of a broader conspiracy or joint criminal enterprise, the lack of co-defendants in Count 7 may suggest a discrepancy in how the charges were framed compared to other counts,

which included co-defendants facing aiding and abetting charges. The absence of co-defendants in this specific charge could imply that the government sought to hold Hambrick solely responsible for the offense, potentially limiting the scope of evidence relating to the involvement of others. The indictment, furthermore, was broadened or altered through improper jury instructions or amendments, such as in the case of *Harrison-Philpot* and *Ford*, where courts have held that changes in the charge that broaden the scope of the indictment or introduce new theories of liability without proper notice violates the defendant's rights, such as failing to instruct the jury on aiding and abetting, as was done in this case on that Count.

In this context, counsel should have challenged the legal sufficiency of Count 7 based on the inconsistency in its framing relative to the other charges. This raises constitutional concerns regarding Hambrick's due process rights, as any expansion of the charges beyond what was originally alleged in the indictment—without proper notice—resulted in an unfair trial. Consequently, Hambrick was prejudiced by the jury instructions failure to provide an instruction of aiding and abetting in that regard.

**(ii). Hambrick was prejudiced by counsel's conduct**

Hambrick asserts that, had counsel properly objected to Jury Instruction 15's use of the term "before" January (and requested a curing instruction in relation to both Turner's and Simon's testimony in that regard); and relatedly, challenged the framing of Count 7 as it relates to aiding and abetting as outlined above, there's a reasonable probability that the outcome of the proceedings, either in the district court, or Eighth Circuit Court of Appeals, would have been different.

This is so because counsel would have been successful, on the first front, in getting both Turner and Simon's testimony struck from the record, which would have resulted, overwhelmingly, in a reasonable probability that the outcome of the proceedings being different. This is so because, outside of the testimony of Wauters, who did not directly connect Hambrick to any criminal offense, the government presented no tangible evidence that Hambrick was involved in the April 9th transaction.

The same principle, in a different context, applies to the proffered claims concerning Count 7 of the indictment. Had counsel properly challenged Count 7's lack of charges against any other party, in conjunction to the manner in which the aiding and abetting allegation was connected to that offense in the indictment but not the jury instruction, there's a reasonable probability that Hambrick would have been successful in proving a constructive amendment of that Count of conviction, i.e., Count 7 would have been dismissed as violative of Hambrick's right to due process of law.

## F.

## COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT HAMBRICK'S BILL OF SALE TO HIS CADILLAC TRUCK WHICH WOULD PROVE, CATEGORICALLY, THAT THE DRUG QUANTITIES ATTRIBUTED TO HIM IN THE PSR WERE BASED UPON INACCURATE INFORMATION

Counsel was ineffective for failing to present Hambrick's bill of sale for his Cadillac Truck prior to and during sentencing to establish that the testimony of Turner and Simon lacked a sufficient-indicia-of-reliability to support its accuracy for the purposes of calculating a drug quantity to attribute to Hambrick, so as to calculate the appropriate sentencing guideline range.

More specifically, Hambrick's bill of sale, Ex. 1, would have categorically proved that the testimony of both Turner and Simon, concerning any purported drug transactions that occurred after December, 2019, in Hambrick's white Cadillac truck, did not occur, at all, being that Hambrick did not purchase a white Cadillac truck until April, 2020 – making all of both witnesses, but Turner, in particular, thoroughly false. That false testimony had the adverse effect of increasing Hambrick's base offense level, and guideline range.

Counsel's performance was deficient, and substantially prejudiced the outcome of the proceedings.

**(i). <u>Counsel's performance was deficient</u>**

Counsel has an absolute duty to investigate particular facts or a certain line of defense. Under *Strickland,* counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691 (1986). As the *Strickland* Court observed, the reasonableness of counsel's acts depends "critically" upon "information supplied by the defendant or the defendant's own statements or actions." Id. at 691. Counsel's conversations with the defendant concerning the facts and circumstances of the case, including discussions relating to witnesses and requests by the defendant, are important when assessing the propriety of counsel's litigation performance. Id.

Collaterally, as a participant in a conspiracy, the defendant is responsible for the acts of his co-conspirators that were within the scope of, in furtherance, and reasonably

foreseeable in connection with the drug distribution conspiracy. U.S. v. Sterling, 942 F.3d 439, 442 (8th Cir. 2019). Again, it must be emphasized that, where there is no drug seizure, as in this case, 'the court shall approximate the quantity of the controlled substance" for sentencing purposes. USSG 2D1 .1 cmt. (n.12). "The court may make a specific numeric determination of quantity based on imprecise evidence." U.S. v. Roach, 164 F .3d 403, 413 (8th Cir. 1998). As section 6A1.3(a) indicates, however, the information underlying the court's approximation *must* possess sufficient indicia of reliability. U.S. v. Ortiz, 993 F.2d 204, 207 (10th Cir. 1993); *see also* U.S. v. Kozinski, 16 F.3d 795, 818-19 (7th Cir. 1994). Unreliable allegations *must not* be considered. U.S.S.G. § 6A1.3 commentary; *see also* Ortiz, 993 F.2d at 207 (emphasis added). The Third Circuit has instructed that section 6A1.3(a)'s reliability standard must be rigorously applied (U.S. v. Miele, 989 F.2d at 664 (3rd Cir. 1993). *See also* Sepulveda, 15 F.3d at 1198 (1st Cir. 1993); Paulino, 996 F.2d at 1545 (3rd Cir. 1993) ("the sentencing court must carefully scrutinize the government's proof to ensure that its estimates are supported by a preponderance of the evidence"). Indeed, notwithstanding the fact that "[A] sentencing court may determine drug quantity *based on the testimony of a co-conspirator alone*" U.S. v. Sarabia-Martinez, 276 F.3d 447, 450 (8thcir. 2002), as the *Paulino* court observed, the need to approximate drug quantity under the Guidelines "*is not a license to calculate drug amounts by guesswork.*" 996 F.2d at 1545 (emphasis added); U.S. v. Walton, 908 F.2d 1289, 1302 (6th Cir.) ("when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution"), cert. denied, 498 U.S. 906, 989, 990 (1990).

Keeping this legal standard in mind, The PSR attributed 46.04 Kg of ice methamphetamine to Mr. Hambrick. (PSR ¶ 60). Of the total amount attributed, 680.4 grams is associated with the April 9, 2020 drug transaction between Leroy Williams and Brian Wauters (221.9 grams of which were actually weighed). The remaining 45,360 grams of methamphetamine are associated with alleged transactions occurring between Turner and Hambrick. Turner, who testified to purported transactions with Hambrick prior to the date charged in the conspiracy, claimed that he purchased a pound at a time from Hambrick prior to December 2019 for an unspecified period of time (TT-III at 415-416), and also, 5-6 ounces of meth 3 or 4 times a week (Id. at 416). These transactions allegedly occurred at Walgreens, at a time prior to December 2019, when Hambrick was driving a white Escalade. (Id., 416-17). Hambrick purportedly fronted Turner meth, and owed Hambrick fifty-five hundred dollars. (TT-II 419;1-5).

Turner testified that the last time he purchased meth from Hambrick was in December 2019 (TT-II 431).

Also, while Simon testified he purchased PCP and Percocet from Hambrick "daily, if not every other day" for "[s]ix months [to] a year," Tr. Vol II, 442:3-12, no amount of controlled substance was attributed to Hambrick through those transactions because "the amount purchased is unknown" (PSR, note 6).

Significantly, Simons testified that he seen, with his own eyes, Kyle Turner walking away from Hambrick's white Escalade without specifying a time period – although Turner specifically testified that, the last time he dealt with Hambrick, was in December of 2019 (TT-II 416-17 compared to 446).

Keeping these facts in mind, both Turner and Simons testified that, prior to April 9, 2020, they both purchased the said controlled substances from Hambrick, at a time Hambrick was allegedly driving his white Escalade truck (TT-II 415-17, 431, 442-446, annexed hereto as Exhibit 3). The bill of sale, however, dated April, 9, 2020, proves without any doubt or contradiction, that both Turner and Simons were lying about all transactions that occurred both before and after December 2019, on up to April 9, 2020. See Ex. 2.

Indeed, the April 9, 2020 bill of sale plainly discredits all of the testimony provided by Turner and Simons in relation to any purported conspiracy charged by the government.

Armed with these facts, the PSR's reliance on the testimony of Turner to attribute over 43 kg of methamphetamine, much less ice methamphetamine, to Hambrick, thereby raising his possible Base Offense Level 34 (if only using the April 9, 2020 transaction) to 38, see USSG § 2D1.1(c)(1), (3) does not possess a sufficient-indicia of reliability to support its accuracy, for the purposes of the calculation of Hambrick's sentencing guideline range. Indeed, that four-level jump in Base Offense Level resulted in a 98 month increase from the bottom of a guideline range of 262-327 months, compared to Hambrick's existing 360-month term of imprisonment.

Sentencing counsel, moreover, failed to specifically object, pointing to relevant case law, to the PSR's reliance upon Brian Wauters guestimation that, when he conducted the transaction with Williams, Williams still had "another pound to a pound and a half" left in the package after the 221.9 grams was weighed and given to him (TR. Vol II 322:25-323:7).

The Probation Department relied on Wauter's testimony in that regard to attribute an additional 453 grams of meth to the actual 221.9 grams of meth that Williams sold, allegedly, via Hambrick, coming up to a grand total of 680 grams, hence, a base offense level of 34. But, as the Third Circuit stated in *U.S. v. Paulino,* 966 F.2d at 1545, the need to approximate drug quantity under the Guidelines "is not a license to calculate drug amounts by guesswork". Id. (stating "the sentencing court must carefully scrutinize the government's proof to ensure that its estimates are supported by a preponderance of the evidence").

To simply accept Wauter's testimony, at face value, without any proof that his eyes and brain has been scientifically equipped with a digital scale, would essentially give the Probation Department "a license to calculate drug amounts by guesswork", id., to arrive at the legal and mathematical conclusion that Hambrick is responsible for an additional 453 grams of meth – and thus, a higher offense level of 34 rather than 32.[8]

To the contrary, rather than just accepting Wauter's unverified word at face value, counsel should have vigorously objected, advising the court to err to the side of caution, by rejecting the additional 453 grams being attributed to Hambrick's USSG 2D1.1 guideline level. See e.g., *U.S. v. Walton*, 908 F.2d 1289, 1302 (6th Cir.) ("when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution").

[8] With a base offense level of 32, Hambrick's sentencing guideline range would be 210-262 months, 150 months lower than the bottom of his existing 360-month guideline range.

Armed with these facts, the record plainly reflects that counsel's performance was deficient.

**(ii). Hambrick was prejudiced by Counsel's omissions**

In *Glover v. U.S.*, 531 U.S. 198; (2001), the Supreme Court made clear that it considered even a minimal amount of additional time in prison to have constitutional implications and to be prejudicial. More specifically, Glover involved a claim of ineffective assistance of counsel for defense counsel's failure to contest the prosecutor's assertion that the defendant's convictions should not be grouped together for purposes of the United States Sentencing Commission Guidelines. Id. at 200-201. According to the defendant, his attorneys' failure to press the grouping issue resulted in a sentence under the wrong guidelines sentencing range. Id. at 202. The Supreme Court agreed that the increase of six to twenty-one months in prison constituted prejudice under *Strickland*, 466 U.S. 668.

Hambrick asserts that, had counsel properly presented Hambrick's bill of sale to his Cadillac in support of a claim that both Turner and Simons testimony should be rejected in its totality for the purposes of sentencing, and moreover, objected to the additional 453 grams of meth attributed to Hambrick's base offense level, there's a reasonable probability that the outcome of the proceedings, either in the district court, or Eighth Circuit Court of Appeals, would have been different.

This is so because, the district court would have been compelled, at sentencing, to reject the PSR's reference to the testimony of Turner, who attributed an additional 45,863 grams to Hambrick's drug quantity calculation. The same principle applies to the additional 453 grams of meth guestimated by the CI, Wauters. The combination of the

elimination of said drug quanities would result in a reduction of Hambrick's base offense level, from 38 down to 32. And a reduction in Hambrick's sentencing guideline range, from 360 months to life down to 210 – 262 months. Again, the Glover court made clear that it considered even a minimal amount of additional time in prison to have constitutional implications and to be prejudicial. 531 U.S. 198; (2001).

Keeping these facts in mind, absent counsel's omissions in this regard, there's a reasonable probability that the outcome of Hambrick's sentencing proceedings would have been different, i.e., he would have received a lower term of imprisonment, being that the sentencing court has already elected to sentence Hambrick at the low end of his existing guideline range. His new range, if calculated correctly, would be 210–262 months. Or, worse case scenario, 262-327 months. This court should thus vacate Hambrick's sentence and remand this case back to the district court for a full resentencing hearing.

Furthermore, Hambrick's claims, in proven true, would entitle to relief from his sentence. This court should thus schedule an evidentiary hearing so as to develop the record on this meritorious issue.

## CONCLUSION

Based upon the foregoing, this court should vacate Hambrick's conviction and sentence and remand his case back to the district court for further proceedings, i.e., a new trial or full resentencing hearing.

On an alternative basis, this court should schedule an evidentiary hearing to flesh out the record on each of Hambrick's meritorious issues.

Respectfully Submitted,

Terry Hambrick
Greenville FCI
P.O. Box 5000
Greenville, Ill 62246

**CERTIFICATE OF SERVICE**

I, Terry Hambrick, hereby certify that I placed a true and accurate copy of the foregoing in the U.S. mailing system, postage pre-paid, first class, on this 17th day of February, 2025.

Office of Clerk
Southern District
Of Iowa
123 East Walnut Street
Des Moines, IA 50309

Terry Hambrick

# EXHIBIT 1

387619

IADA SERVICES, INC. - WEST DES MOINES, IA 50265 - To Order Forms Call 800 [illegible]

# MOTOR VEHICLE PURCHASE AGREEMENT

No. ____________
Customer No. ________

DATE 04/09/2020

MURRAY MOTORS
2602 NE BROADWAY
DES MOINES IA, 50317
(515) 262-8244

BUYER DAISHA ALISE HAMBRICK
CO-BUYER
ADDRESS 3211 30TH ST APT E26
ADDRESS LINE 2
CITY DES MOINES STATE IA 50310
EMAIL ADDRESS
RES. PHONE (618) 203-6242 CELL WORK
SALESPERSON BUYER'S REGISTRATION MONTH November COUNTY POLK

DESCRIPTION OF PURCHASED VEHICLE: ☐NEW x☐USED ☐DEMO ☐CAR ☒TRUCK ☐VAN ☐OTHER

STOCK NO. 11315 YEAR 2007 MAKE CADILLAC MODEL ESCALADE EXT BODY TYPE AWD 4DR CREW CAB
V.I.N. 3 G Y F K 6 2 8 7 7 G 2 6 6 3 5 2 TRIM BLACK COLOR PEARL
TO BE DELIVERED ON OR ABOUT 04/09/2020

| | | |
|---|---|---|
| PRICE OF VEHICLE | $ | 10900.00 |
| ACCESSORIES: | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| DOCUMENTARY FEE | $ | N/A |
| $ 10900.00 CASH PRICE | $ | 10900.00 |
| $ N/A LESS DOCUMENTARY FEE | | |
| $ 3600.00 LESS TRADE-IN ALLOWANCE | | |
| $ N/A LESS MANUFACTURER'S REBATE | | |
| $ N/A | | |
| $ 7300.00 AMOUNT SUBJECT TO FEE FOR NEW REGISTRATION | | |
| FEE FOR NEW REGISTRATION | $ | N/A |
| TITLE FEE | $ | N/A |
| LICENSE FEE | $ | N/A |
| LIEN FILING FEE (cross out; only see (1) on page 2) | $ | N/A |
| ELECTRONIC REGISTRATION & TITLING FEE | $ | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| | | N/A |
| TOTAL CASH DELIVERED PRICE | $ | 10900.00 |
| LESS TOTAL DOWN PAYMENT or PLUS AMOUNT OWED | $ | 10900.00 |
| UNPAID CASH BALANCE DUE ON DELIVERY | $ | N/A |

OTHER INFORMATION OR TERMS OF SALE:

NONE

**TRADE-IN ALLOWANCE AND OTHER CREDITS:**

YEAR 2006 MAKE GMC MODEL ENVOY X BODY TYPE 4DR SUV 4X
VIN 1 G K E T 6 6 M 9 6 6 1 6 4 3 3 5
BALANCE OWED TO N/A
YEAR MAKE MODEL BODY TYPE
VIN
BALANCE OWED TO

| | |
|---|---|
| TRADE-IN GROSS ALLOWANCE | $ 3600.00 |
| LESS AMOUNT OWING | $ 0.00 |
| NET TRADE-IN ALLOWANCE OR REMAINING TRADE-IN DEBT | $ 3600.00 |
| CASH DOWN PAYMENT OR DEBIT BALANCE | $ 7300.00 |
| [illegible] | [illegible] |
| TOTAL DOWN PAYMENT or AMOUNT OWED | $ 10900.00 |

## BUYER'S TRADE-IN CERTIFICATION

**If you are trading in a vehicle, you certify the following:**

1. That there is no salvage, repair or other history on the vehicle title that would affect the value of the vehicle. If there is salvage, repair or other history on the title, you agree that the dealer may cancel this sale. That to the best of your knowledge, the vehicle was never on or required to be on a salvage, rebuilt, flood or branded title in this or any other state.
2. That the air bags are intact and in working order.
3. That while you have owned the trade-in, its odometer has not been repaired, replaced, tampered with or altered in any way. That the odometer statement, damage disclosure statement and prior vehicle history which you provided us for your trade-in is true and correct.
4. That the original emission control system (including the catalytic converter) is intact. That the engine and transmission have not been changed from the manufacturer's original specifications. That the trade-in does not have a cracked or defective head, block, powertrain or frame.

## WARRANTY DISCLAIMER

*YOU UNDERSTAND THAT THE VEHICLE IS SOLD "AS IS" WITHOUT ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE,* or any other warranties, express or implied, covering the vehicle unless we make a written warranty to you or unless we enter into a service contract with you within 90 days from the date of this contract. If we do so, any implied warranty will last only as long as the limited written warranty.

This provision does not affect any warranties which may be provided by the manufacturer. If there is a manufacturer's warranty on the vehicle, we are not a party to it and it is not a part of this contract. If we are authorized by the manufacturer to perform warranty work on your vehicle, we hope that you ask us to perform the work. However, the manufacturer's warranty is between you and the manufacturer.

[signature]

Documentary Fee. A documentary fee is not an official fee. A documentary fee is not required by law, but may be charged to a buyer for the preparation of documents and the performance of related services. The maximum amount that may be charged for a documentary fee is determined by Iowa Code Section 322.19A. This notice is required by law.

You understand that this agreement *(including the terms on page 2)* is an offer to purchase the vehicle described which will become a binding contract once the dealer has signed it. This document represents the complete agreement between you and the dealer regardless of any other oral, written or prior agreements or representations. However, if you are buying a used vehicle, the information you see on the window form for this vehicle is part of the contract and the information on the window form overrides any contrary provision in this contract. [La informacion que aparece en la ventanilla de este vehiculo forma parte de este contrato. La informacion contenida en el formulario de la ventanilla anula cualquier prevision que establezca lo contrario y que aparezca en el contrato de venta.]

Iowa law requires us to give you the following notice: You understand that liability insurance coverage which would protect you under the Iowa Motor Vehicle and Safety Responsibility Act IS NOT INCLUDED in your purchase of this motor vehicle.

By signing this contract, you are certifying that you are at least 18 years old (if there are two buyers, that at least one of you is 18 years old), that you have read this contract, pages 1 and 2, and agree to its terms, and that you have received a copy of it.

X [signature] 11/03/1999
Buyer's Signature Date of Birth

938AL1892
Buyer's Driver's License or F.I.D. No.

X ____________
Co-Buyer's Signature Date of Birth

Accepted By: [signature]
Dealer's Authorized Representative

Co-Buyer's Driver's License or F.I.D. No.

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF IOWA**

**TERRY HAMBRICK,**

Petitioner,

Vs. Case No. 4:20cr189

**UNITED STATES OF AMERICA,**

Respondent.

**AFFIDAVIT**

**STATE OF WEST VIRGINA )**
**):ss**
**COUNTY OF MCDOWELL )**

**ACKNOWLEDGMENT**

I, Leroy Williams II, Reg. No. 39471-509, hereby depose and state, under the penalty of perjury pursuant to 28 U.S.C. 1746, that the following is true and correct:

1. In 2021, I plead guilty to conspiring to possess with intent to distribute methamphetamine with individuals known and unknown to the grand jury, pursuant to the above-mentioned cause of action;
2. As part of that plea agreement, I agreed that I engaged in conduct involving the April 9, 2020 distribution of methamphetamine.
3. Notwithstanding that admission, one I made in the best interest of securing a favorable plea agreement, never, at anytime throughout the course of my plea agreement, did I admit that I secured any methamphetamine from co-defendant Terry Hambrick – because I did not.
4. More specifically, Mr. Hambrick did not supply me with methamphetamine on April 9, 2020. Nor was Mr. Hambrick my supplier.

5. I inadvertently got Mr. Hambrick ensnared into my conspiracy by using an empty plastic bag I got off the floor of his vehicle when we met up so he could loan me some money he had agreed to loan me a few days prior.
6. I seen the empty plastic bag on the floor of his vehicle and asked him could I have it. He said I could. I stuffed it in my pocket.
7. Later, when I took the Confidential Informant to my stash house (where I actually had the drugs), after I pulled the drugs out from under the bed along with a triple beam scale, I weighed the requested amount of drugs (1/2 pound of methamphetamine). I put the drugs back into the original wrappings and place that package into the empty plastic bag I obtained from Mr. Hambrick's vehicle.
8. Mr. Hambrick didn't know I sold drugs and didn't know why I needed that empty plastic bag. He didn't ask and I didn't volunteer the information. His being in the area was a simple matter of convenience and timing since I was going to be over on his side of town to distribute the methamphetamine I had left to the confidential informant.
9. My attorney at the time (Andrew Dunn) informed me that the AUSA would give me a substantial time reduction if I testified against Mr. Hambrick. I told my attorney that I couldn't do that in good conscious because Mr. Hambrick never gave me any drugs and I was baffled how Mr. Hambrick was even involved.
10. I pled guilty less than 30 days after my initial appearance and gave no pre or past Miranda interviews. I was never called as a witness for or against Mr. Hambrick. But I would have testified on behalf of Mr. Hambrick had he or his attorney ever approached. Mr. Hambrick's attorney, however, never approached me about testifying.
11. I am making these statements voluntarily on my own volition in the interest of justice and to correct the record on behalf of Mr. Hambrick.

Further, the affiant sayeth not.

Executed on this 13 day of NOVEMBER, 2024.

LeRoy Williams II

Leroy Williams II

# EXHIBIT 3

sir, to what's been marked as Government's Exhibit 207.
A. Yes, ma'am.
Q. Do you recognize what this is a photo of?
A. Yes, ma'am.
Q. What is this a photo of?
A. A picture of me.
MS. TUBBS: Move to admit Government's Exhibit 207.
MR. DYER: No objection, Judge.
MR. BERTOGLI: No objection.
THE COURT: 207 is admitted.
BY MS. TUBBS:
Q. Sir, how would you describe your relationship with Terry Hambrick?
A. There wasn't one outside of drug dealing.
Q. Do you know Terry Hambrick to go by any nicknames?
A. T-Ham.
Q. How much meth would you buy from Terry Hambrick?
A. Anywhere from an ounce to a pound at a time.
SD Q. In approximately December of 2019, did you nearly fatality overdose?
A. Yes, ma'am.
Q. Before your overdose, how much methamphetamine were you buying from Terry Hambrick?
A. Anywhere from an ounce to 5 ounces, 6 ounces at a time.
Q. Before your overdose, how often would you meet up with

Terry Hambrick?
A. Three to four times a week.
Q. After your overdose, did you continue to buy meth from Terry Hambrick?
A. Yes, ma'am.
Q. After your overdose, how often would you meet with Terry Hambrick?
A. Three to four times a week still.
Q. How much were you getting from him on each of those times?
A. A pound at a time. Anywhere from a pound to 2 pounds.
Q. How long was it that you were meeting with him to get between 1 and 2 pounds each time?
FD1 A. Thirty to 45 days.
Q. How would the meth that Terry Hambrick sold you be packaged?
A. In Saran -- wrapped in Saran Wrap in a cylinder-like object.
Q. Would you sell the meth that you would buy from Terry Hambrick?
A. Yes, ma'am.
Q. Who would set the price that you sold the meth for?
A. I would.
Q. Not Mr. Hambrick?
A. No.
Q. Where would you meet Terry Hambrick to buy meth from him?

A. Walgreens.
Q. Can you be a little bit more specific.
A. Well, either Walgreens on -- there's two on Euclid, so both of the Walgreens on Euclid.
Q. If you could now look at the binder in front of you to -- actually, I'll display it on the screen in front of you, if I could -- what's been previously admitted as Government Exhibit 416.
Do you see that on the screen in front of you?
A. Yes, ma'am.
Q. Do you recognize what this is a map of?
A. Yes, ma'am.
Q. What do you recognize it as?
A. The Hy-Vee that I used to meet Mr. Hambrick at.
Q. And is there a Walgreens --
A. Or the Walgreens. Excuse me. The Walgreens, yes.
Q. -- below the Hy-Vee?
A. Yes, ma'am.
Q. But you do see there is a Hy-Vee across the street?
A. Yeah. That's what I was reading. Yes, ma'am.
Q. And where would you meet with him, the Hy-Vee or the Walgreens?
A. The Walgreens.
Q. If you could use your finger -- what's in front of you is a touch screen -- could you mark where in the parking lot you

would meet with Mr. Hambrick to buy meth.
A. About right there.
MS. TUBBS: May the record reflect that the witness has marked above the indication that it is Walgreens on the map?
THE COURT: Yes.
BY MS. TUBBS:
Q. You mentioned another Walgreens on Euclid where you would meet up with Terry Hambrick. Where was that Walgreens located?
A. By Park Fair Mall.
Q. Would there be other people there when you would meet with Terry Hambrick to buy meth from him?
A. On occasions, yes.
Q. Did you know these other people other than seeing them in passing?
A. No.
Q. How much would Terry Hambrick charge you for a pound of meth?
A. $4,500.
Q. Would you pay Terry Hambrick up front or after you sold the meth?
A. After I sold the meth.
Q. Do people pay cash for drugs?
A. Yes.
Q. And is that how you were paying him?

purchased methamphetamine from Mr. Hambrick?
A. December of 2019.
Q. December of 2019 is the last time you purchased methamphetamine from Mr. Hambrick?
A. Or January -- December or January of 2019-2020.
Q. Okay. So all of these pound and pound and pound transactions that you were talking about happened sometime before January 2020?
A. Yes.
Q. Okay. So it's fair to say that nothing that you have testified to today has anything to do with, for example, the 9th of April, 2020? Is that -- yes or no.
A. I'm not for sure what you're asking.
Q. Well, you say the last time you purchased methamphetamine from Terry Hambrick was January 2020; right?
A. Yes.
Q. Okay. So in April of 2020 --
A. Yes.
Q. -- after January; right --
A. Yes.
Q. -- you didn't buy anything from Terry?
A. No.
Q. Okay. Including the 9th of April?
A. Yes.
Q. Okay. And so even if we are to assume that everything

you've testified to here is true, it doesn't have anything to do with the 9th of April, 2020?

A. No.

Q. Okay. Now I want to talk -- I want to move a little bit further down in these pages.

Okay. It's page 6.

THE COURT: Sir, he's looking at --

BY MR. DYER:

Q. Page 6 of Exhibit --

THE COURT: -- 414, and it's in your book.

One moment, Mr. Dyer.

MR. DYER: Sorry.

THE COURT: 414. So it will be behind that.

Proceed.

MR. DYER: Thank you, Judge.

BY MR. DYER:

Q. Okay. I don't know a lot about the distribution of methamphetamine. What I'm interested in, it looks like it's about five lines up from the bottom on page 6 where you're talking about how you still can't pay because you're in treatment. And you say, "Just know the feds are watching me. My dad just got indicted for eight keys."

A. Yes.

Q. Okay. Now pretty sure I know that a key is short for a kilo; is that fair?

2



Q. What is this a map of?
A. The Walgreens, one of our meeting locations.
Q. What's in front of you is a touch screen, so if you could please use your finger to mark an "X" where you would meet with Mr. Hambrick to buy drugs from him.
A. (Witness complied.)
MS. TUBBS: May the record reflect that the witness has placed an "X" above the location marker for Walgreens?
THE COURT: Yes.
BY MS. TUBBS:
Q. How often would you meet at this particular Walgreens with Mr. Hambrick to buy drugs from him?
A. It just depended on what side of town he was located on whether it be the upper or higher --
Q. The upper --
A. Upper or lower --
Q. Walgreens?
A. -- part of Euclid.
Q. Okay. When you would meet with Terry Hambrick, would there be other people who would meet with him at the same time that you would?
A. Yes.
2- Q. When you would meet with him, was he in a car?
A. He was in his truck.
Q. Describe his truck.

A. A pearl Cadillac truck.
Q. Were there other cars that you saw him drive?
A. He would drive sometimes a white truck.
Q. Do you know what brand of vehicle that truck was?
A. I want to say a Yukon.
Q. Have you ever seen Terry Hambrick with methamphetamine?
A. Yes, I have.
Q. How many times that you recall?
A. Twice.
Q. Tell me about the first time that you saw him with meth.
A. I had met him at the East 14th and Euclid QuikTrip to purchase something from him, and I observed it in the vehicle with him.
Q. You observed the meth in Terry Hambrick's car?
A. Yes.
Q. Did you talk about it?
A. I asked him what he was doing with that, and his response was, "Just another avenue of getting to the money."
Q. When was the second time that you saw Terry Hambrick with meth?
A. It would have been at the Park Fair -- at the Park Fair location Walgreens.
Q. Tell me more about that.
A. The quantity that I observed him with then would have been a larger quantity.

A. Yes.
Q. Have you used drugs in the past, sir?
A. Yes.
Q. What was your drug of choice?
A. PCP, marijuana.
Q. If you could now turn to the front of the binder to Government's Exhibit 206. 206, sir.
Do you recognize what this is a photo of?
A. Yes.
Q. Who is it?
A. Myself.
MS. TUBBS: Move to admit Government's Exhibit 206.
MR. DYER: No objection, Judge.
MR. BERTOGLI: No objection.
THE COURT: 206 is admitted.
BY MS. TUBBS:
Q. How is it that you first came to know Terry Hambrick?
A. Within a seven-year time frame, mutual friends.
Q. Is it fair to say, then, that you have known him for several years?
A. Yes.
Q. Were you and Terry Hambrick friends?
A. Yes.
Q. Do you know Terry Hambrick to go by any nicknames?
A. Yes.

Q. What nickname?
A. T-Ham.
Q. What drug would you buy from Terry Hambrick?
A. PCP.
Q. Did you buy any other drug from him?
A. There's been times where I bought Percocet.
Q. How often would you meet with Terry Hambrick to buy drugs from him?
A. I would say daily, if not every other day, for sure.
Q. Over how many months did you meet with Terry Hambrick on a daily or every-other-few-day basis to buy drugs from him?
A. Six months, a year.
Q. Where would you meet Terry Hambrick to buy drugs from him?
A. Several different locations. Some would be Walgreens on Second and Euclid. Some would be Walgreens at the 3800 block of Euclid. QuikTrip, East 14th and Euclid.
Q. So two Walgreens, both on Euclid?
A. Yes.
Q. That was some of the locations that you would meet Mr. Hambrick to buy drugs from him?
A. Yes.
Q. If you could now look at the screen in front of you, we'll display, please, Government's Exhibit 416.
Do you see that on the screen in front of you?
A. Yes.

5 Lay-Shit



Q. And have you ever talked to Terry Hambrick about making money from selling meth?
A. There was an instance where he had referred to the selling of it where there was an individual who owed him for it.
Q. Has he ever talked to you about how much money he personally made from specifically selling meth?
A. Well, he told me -- it would be -- it could be from different narcotics that he was selling, but there's been times where a conversation has arose where we have praised each other's financial or materialistic gains from it.
Q. Sir, do you know Leroy Williams?
A. Yes.

MS. TUBBS: If I could display on the screen Government's previously admitted Exhibit 202?

THE COURT: Yes.

BY MS. TUBBS:
Q. Who is this?
FSA → A. Leroy.
Q. Does Leroy Williams know Terry Hambrick?
A. Yes, he does.
Q. Have you ever seen them together?
A. No. I haven't seen them together.
Q. How do you know they know each other?
A. Through our mutual friends.
Q. Do you know someone by the name of Kyle Turner?

3



A. I know of him.

MS. TUBBS: If we could display Government's Exhibit 207.

THE COURT: Yes.

BY MS. TUBBS:

Q. Do you recognize who this is, sir?

A. Yes.

3 → Q. Who is this?

A. That would be Mr. Turner.

Q. How do you know Kyle Turner?

A. This was the individual that I observed walking away from Hambrick's car. And when I got in, he had mentioned it. He had owed him a significant amount of money.

Q. I want to break that down a little bit. So there was an instance when you were meeting with Terry Hambrick, and you saw Kyle Turner?

A. Yes.

Q. And after Kyle Turner left, Terry Hambrick talked to you about Kyle Turner?

A. Yes.

Q. What was it that Terry Hambrick said to you about Kyle Turner?

A. That he might have to take different measures with the individual that owed him somewhere roughly around $5,000 and was refusing to pay him.

That Brian Wauters found 72 grams of methamphetamine on the side of the road and then he tricked Kieffer Simmons into saying the words 72 on the audio recording? That he had Kieffer Simmons bag up the methamphetamine that he found on the side of the road, or that he somehow made Kieffer Simmons wonder out loud what he should charge for 2 1/2 ounces of methamphetamine that he never had?

Because, to be clear here, the defense has to be that Brian Wauters lied, not that he was mistaken, not that he misremembered, because he was unequivocal in what he told you. The defense has to be that he got on the witness stand, took an oath to tell the truth, put his cooperation agreement on the line, and lied that Kieffer Simmons sold him methamphetamine, and then he just had to cross his fingers and hope that the rest of the evidence backed up his lie.

Use your reason and your common sense. This was a drug deal, and Kieffer Simmons did the dealing.

Let's move on to Terry Hambrick's distribution to Leroy Williams. That has two elements. They're the same elements as in Count 2: First, that on April 9, 2020, Terry Hambrick intentionally transferred methamphetamine to another person, in this case Leroy Williams; and, second, that at the time of that transfer, the defendant knew that the substance he transferred was methamphetamine.

Here's what happened on April 9. Brian Wauters had

been buying methamphetamine from Leroy Williams, and on April 9, he ordered up a half pound. Leroy Williams told him, We're going to meet where the methamphetamine is at, where Leroy Williams' source will be, where he's picking up the methamphetamine.

And where is that? Well, Leroy Williams knows because he's been there before. It's going to be behind the Walgreens on Euclid because that's where Terry Hambrick does his drug deals, that's where he sold drugs to Leroy Williams, that's where he sold drugs to Demarkus Simon, that's where he sold drugs to Kyle Turner.

So the CI shows up, and Leroy Williams is in a tough spot because the CI is not going to give Leroy Williams his money without seeing the product. That's what he told you.

But Leroy Williams is buying way more than what Brian Wauters came for. He's buying way more methamphetamine from Terry Hambrick than just what he is selling to Brian Wauters. And he can't go into debt with Terry Hambrick. He doesn't want to end up like the Kyle Turners of the world, so he begs the CI. Give me your money, man. Trust me, Brian. You have to trust me. My guy is not going to take your money. He drives a white Escalade. He's making all kinds of drug money. Terry Hambrick makes so much drug money, Brian, he has a machine that counts his money.

So the CI relents, and he gives Leroy Williams his

Retail

U.S. POSTAGE PAID
PME
OMAHA, NE 68132
FEB 19, 2025
50309
$31.40
RDC 07
S2324E501280-26

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

# PRIORITY MAIL EXPRESS®

## FLAT RATE ENVELOPE

ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

PS10001000006

EP13F October 2023
OD: 12 1/2 x 9 1/2

This package is made from post-consumer waste. Please recycle - again.

UNITED STATES POSTAL SERVICE® | PRIORITY MAIL EXPRESS®

ER 193 643 175 US

CUSTOMER USE ONLY

FROM: (PLEASE PRINT) PHONE ( )

Terry Hambrick
Greenville FCI
PO Box 5000
Greenville, Ill 62246

DELIVERY OPTIONS (Customer Use Only)

☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE ( )

Office of Clerk
Southern District
123 East Walnut St. Ste 300
Des Moines, IA 50309

ZIP + 4® (U.S. ADDRESSES ONLY)

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

PEEL FROM THIS CORNER

PAYMENT BY ACCOUNT (if applicable)
Federal Agency Acct. No. or Postal Service™ Acct. No.

ORIGIN (POSTAL SERVICE USE ONLY)

| ☐ 1-Day | ☐ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|
| PO ZIP Code: 68132 | Scheduled Delivery Date (MM/DD/YY): 02/20/25 | Postage: $ 31.40 | |
| Date Accepted (MM/DD/YY): 02/19/25 | Scheduled Delivery Time: ☐ 6:00 PM | Insurance Fee: $ | COD Fee: $ |
| Time Accepted: 3:39 ☐ AM ☑ PM | | Return Receipt Fee: $ | Live Animal Transportation Fee: $ |
| Special Handling/Fragile: $ | Sunday/Holiday Premium Fee: $ | Total Postage & Fees: $ 31.40 | |
| Weight: 10 lbs. 9.0 ozs. ☑ Flat Rate | Acceptance Employee Initials: CC | | |

DELIVERY (POSTAL SERVICE USE ONLY)

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |
| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
| | ☐ AM ☐ PM | |

LABEL 11-B, NOVEMBER 2023 PSN 7690-02-000-9996

PAPER POUCH how2recycle.info

UNITED STATES POSTAL SERVICE®

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuses may be a violation of federal law. This package is not for resale. EP13F © U.S. Postal Service; October 2023; All rights reserved.